I .THOMAS F. DALEY, Judge.
The defendant has appealed his conviction of second degree murder. For reasons assigned, we affirm.

FACTS:

Richard Bruches, Anthony Básele, and defendant, Emerson Simmons, were longtime friends. These three young men forced their way into the home of Harry Heller, then proceeded to rob and kill Mr. Heller. Mr. Básele pled guilty to first degree murder, and Mr. Bruches pled guilty to accessory after the fact to first degree murder. Following a jury trial, the defendant was convicted of second degree murder and sentenced to life in prison.
The following facts were developed from the trial testimony. Bruches, Básele, and the defendant frequented a Metairie bar called Gilligan’s, owned by C.J. Gai. |?The defendant lived with his friend, Allen Brown, and Brown’s parents at 909 Helois Street.
During the summer of 1995, Bruches and Básele were in need of money for a planned trip to Florida. They decided to raise the money by committing a robbery. The defendant agreed to become involved. The defendant testified that he asked Gai, with whom he had a close friendship, to suggest someone he and his companions could rob. Gai suggested Harry Heller, his former business partner. Gai advised the defendant that Heller, who owned a nearby bar called Shooters, would have a great deal of cash on hand during the July 4th holiday weekend.
On the night of July 1, 1995, the defendant, Básele, and Bruches gathered at Gilligan’s and walked to Heller’s house. Each of them was armed.
Mr. Heller was at home alone. Bruches testified that he rang the doorbell, and Heller answered the door. Defendant and Básele surprised the victim from behind, and forced him into the house. Heller was forced to lie on the floor, and the perpetrators bound his hands with tape. Básele and Bruches helped Heller into a chair in the living room. Básele took Heller’s wallet and passed it to Bruches. Bruches took money from the wallet and placed the wallet on a table. The men ransacked the house looking for more valuables. They took a medallion and chain and a cluster diamond ring worn by Heller. They also took Heller’s gold belt buckle.
On Bascle’s instruction, Bruches took Heller’s car keys and drove away in the victim’s Maserati automobile. Bruches drove around the block twice, waiting for his companions to. exit the house. He became concerned when he spotted a po *942 lice car in the neighborhood, so he went to Gilligan’s. He left the car parked outside the bar and had another friend drive him to the Browns’ house.
|/The three men met at Brown’s house, and divided Heller’s cash and property among themselves. Bruches testified that he received three hundred dollars and a gold chain. The defendant testified that he received two hundred fifty dollars, but gave one hundred of that to Básele.
Bruches became concerned that his fingerprints were on the victim’s wallet, and went to the house to retrieve it. The men abandoned Heller’s car in New Orleans, then returned to Gilligan’s. They remained there, consuming alcohol and narcotics until 6:00 a.m. in the morning.
Stephen Collet, a friend of the three men, testified that he was at Gilligan’s that night. He further testified the defendant stated that he and the others had committed a robbery, and that they had killed someone. Básele told Collet that he had “shot some guy,” and he showed Collet the rings he had taken from the victim. James High, who was also at Gilligan’s on the night of July 1, testified that he heard the defendant say something about someone’s head getting blown off.
On the morning of July 2, 1995, Básele instructed Bruches to go to Florida without him. Bruches took a bus that day to Key Largo, Florida, where he stayed with a friend, Sonny Vasquez. The defendant and Básele remained in Jefferson Parish.
Terry Eldridge, the manager of Shooter’s, became concerned when Heller did not arrive at a scheduled meeting on the morning of July 2. On Eldridge’s request, Deputy Janice Little and Sergeant Rosato went to Heller’s house to investigate, and found the victim’s body slumped over on the living room chair.
Lieutenant Maggie Snow testified that on July 2, 1995, Básele reported to police that two guns (a .380 caliber Lorcin and a .25 caliber Lorcin), had been stolen | ¡from his residence. Básele informed police that the only people who had access to those guns were defendant and Bruches.
Chief Richard Rodrigue testified that he received a telephone call from an acquaintance, Bob Hamilton, on July 7, 1995. Chief Rodrigue testified that Mr. Hamilton informed him that his granddaughter’s husband, Anthony Básele, had been bragging about killing Harry Heller. Básele had mentioned two individuals named Emerson and Ritchie were also involved.
Mr. Heller’s car was recovered and impounded. The defendant’s fingerprints were found on the car, as well as at the murder scene. Bascle’s fingerprints were lifted from a carbine found near Heller’s body. Arrest warrants were issued for Básele, Bruches, and defendant. The three men were subsequently arrested, and search warrants were issued for their residences. During the search of the Browns’ home, police recovered Heller’s gold belt buckle and spent .25 and .380 caliber shell casings.
Detective Grey Thurman testified that Básele gave a statement, during which he said defendant shot Heller. According to Básele, defendant said, “This is for C.J.” After pleading guilty to first degree murder, Básele gave a different account of the shooting. He told Det. Thurman and Lt. Snow that he, and not defendant, put the gun to Heller’s head and shot him. Thurman interviewed Allen Brown, who reported that defendant and Básele had spoken of throwing a .380 handgun into the canal on West Napoleon. On July 15, 1995, Thurman and other officers recovered a .380 Lorcin handgun from the canal. Ballistics tests showed the gun fired the bullet that killed Heller.
During his trial testimony, defendant admitted to having planned the burglary of Heller’s home. He further admitted that he went into the house with a loaded gun, |fibut denied he ever intended that Heller die. He testified that he never possessed the .380 Lorcin handgun, and that it was Anthony Básele who shot the victim. The *943 defendant testified that Básele fired a gun at a distance of three to four feet from Heller, hitting the victim in the head. The autopsy protocol report shows, however, that Heller’s wound was caused by a gun held against the victim’s head. During the testimony of Mrs. Heller, a letter from Básele to Mrs. Heller was introduced. In this letter, Básele stated, “I’m not the one who pulled the trigger. I’m not going to give up my life for what happened. I promise I’ll do everything I possibly can to guarantee to Emerson Simmons and C.J. to pay for what they did to your husband.” Another letter from the defendant to Mrs. Heller was also introduced. In that letter defendant wrote, “I would like to offer you my word that C.J. is in this up to his neck.”
At the conclusion of trial, the defendant was found guilty as charged. He timely filed this appeal.

DISCUSSION:

In his First Assignment of Error, the defendant contends the Trial Court erred when it read a portion of the Bill of Indictment to the jury without clarifying that it was not evidence. He complains that the -manner in which the trial judge read the murder charge to prospective jurors during voir dire constituted an improper comment on the evidence [1].
|7In reading the murder charge from the bill of indictment, the judge stated, “In this case, the State of Louisiana alleges that on or about July 2 nd, 1995, in Jefferson Parish, the defendant, Emerson Simmons, did violate Louisiana Revised Statute, 1430.1[sic], in that he did commit second-degree murder of Harry. 0 Heller.” Defendant asserts that he was prejudiced because the judge failed to advise the jurors that the bill of indictment was merely a charge by the state and not evidence.
It is first noted, and defendant concedes, that he did not make a contemporaneous objection to the court’s reading of the charge. Generally, an error is not preserved for appeal unless it was objected to at the time of its occurrence. LSA-C.Cr.P. art. 841. However, in State v. Colligan, 95-880, (La.App. 3 Cir. 8/7/96), 679 So.2d 184, 190, the court addressed the defendant’s complaint that the judge improperly commented on the evidence despite the failure of the defendant to object at trial. The court, in Colligan, considered the claim of improper comments by the judge to be on par with that of improper remarks by a prosecutor. This court has held that, despite a lack of timely objection by defense counsel to a prosecutor’s closing remarks, those remarks which are extremely inflammatory or prejudicial require reversal. See, State v. Rochon, 98-717, p. 5 (La.App. 5 Cir. 3/10/99), 733 So.2d 624. Thus, we find the issue of whether the judge’s reading of the indictment to the jury constituted an improper comment on the evidence to be properly before us, despite the lack of a timely objection.
The defendant urges that the facts in the instant case are analogous to those in Colligan. In Colligan, the reviewing court reversed the defendant’s conviction based on the following jury charge:
The defendant is charged with molestation of a juvenile. John W. Colligan, at the Parish of Evangeline on or about the 23rd day of July, 1993 did willfully and unlawfully violate Revised Statutes 14:81.2 relative to molestation of |sa juvenile in that being over the age of 17 years did commit the lewd and lascivious act of molestation upon the person of [A.F.], and in the presence of [A.F.], a child under the age of 17 years with the intent of arousing or gratifying the sexual desires of himself or and/or the said child by the use of influence by virtue of *944 a position of control or supervision over the child.
State v. Colligan, 95-880 at p. 10, 679 So.2d at 189-190.
The reviewing court found:
In this case, the trial judge informed the jury that the defendant was guilty. The state contends that the judge was merely reading the bill of information to the jury, that this was clear to the jury, and that the jury was not misled. While the trial judge’s action can be interpreted as the state suggests, we cannot agree that such an interpretation is the only reasonable interpretation to a jury. At no time did the trial judge inform the jury that he was only reading the bill of information to them.

Id.

As the state argues, the facts in this case can be easily distinguished from those in Colligan. The trial court herein clearly prefaced its reading of the charge with, “the State of Louisiana alleges. ...” The court thereby made it clear to the jurors that the charge was simply an accusation made by the state. Moreover, the trial judge in this case clearly instructed the jury at the close of trial that the indictment was not to be considered as evidence, and specifically stated:
An indictment or bill of information is nothing more than a written formal accusation against the defendant charging him with a crime. You are not to consider the indictment or bill of information as evidence for or against the defendant. The mere filing of an indictment or bill of information creates no inference, whatsoever, that the defendant is guilty.
We find the judge’s reading of the charged offense did not affect the verdict.
In his Second Assignment of Error, the defendant argues the Trial Court erred when it refused to give a contemporaneous limiting instruction on the use of prior Jcjnconsistent statements. Defendant here complains that he was prejudiced by the trial court’s denial of his request for an immediate limiting instruction after he was questioned about state witness James High’s contradictory statements.
During the state’s case, James High testified that he encountered defendant at Gilligan’s after the murder on the night of July 1, 1995. He testified that defendant said something to him about someone’s head being blown off. High admitted giving a statement to Lieutenant Snow, during which he quoted defendant as having said he himself had blown someone’s head off. High testified that this statement was a lie. During his testimony, High also discussed a letter he had written to defendant in prison, stating he had let Lieutenant Snow know his original statement was false. Defense counsel did not request a limiting instruction as to High’s prior inconsistent statement during the course of High’s testimony.
It was not until much later in the proceedings, when defendant commented on High’s testimony, that counsel requested such an instruction. At that time the judge denied the request, stating that she would give the pertinent instruction at the conclusion of trial. The defendant’s testimony concluded the evidentiary portion of the trial, and the court thereafter instructed the jury. The jury charge included proper limiting instructions regarding pri- or inconsistent statements made by a witness.
The defendant argues that the court’s failure to provide limiting instructions at the time of his request constitutes reversible error. We disagree.
h Article 105[2] requires a limiting instruction only where the defendant makes *945 a proper request. Defense counsel’s request for a limiting instruction as to James High’s prior inconsistent statement should have come during High’s own testimony, not during the defendant’s much later testimony.
The trial court fully and properly instructed the jury on the issue, and said instruction immediately followed defendant’s testimony. In State v. Jones, 94-0926, pp. 6-7 (La.App. 4 Cir. 12/28/94), 648 So.2d 472, 476-77, writ denied, 95-0272 (La.6/16/95), 655 So.2d 346, the court held that the trial court did not err in giving limiting instructions regarding a witness’ prior inconsistent statement at the end of trial rather than when requested, since the evidence at issue was elicited just before the end of trial. We find no error in the trial court’s failure to give the limiting instruction at the time it was requested.
In his Third Assignment of Error, the defendant contends the Trial Court erred when it re-instructed the jury outside the presence of the appellant.
The defendant argues his due process rights were violated when the trial court gave the jurors additional instructions out of his presence. After deliberations had begun, jurors requested that the trial judge re-read the law pertaining to second degree murder. At that point defendant was not in the courtroom. His attorney stated, “Your Honor, for the convenience of the jury and the Court, I will waive my client’s presence at this point.” The jurors were brought into the courtroom and the court |ninstructed them as to the law on second degree murder, and the definitions of general criminal intent and specific criminal intent. Following a bench conference, the court re-read to the jury a portion of the second degree murder statute. The defendant was still absent during this re-reading.
The jury exited the courtroom, but was brought back at the state’s request for additional instruction on the law pertaining to second degree murder. Then, at defense counsel’s request, the jury was instructed on the law pertaining to the lesser offense of manslaughter. The record reflects that the defendant returned to the courtroom after this second instruction, when the jury reached a verdict.
LSA-C.Cr.P. art. 831 provides that a defendant charged with a felony shall be present:
(3) At the calling, examination, challenging, empaneling, and swearing of the jury, and at any subsequent proceedings for the discharge of the jury or of a juror;
[[Image here]]
(5) In trials by jury, at all proceedings when the jury is present, and in trials without a jury, at all times when evidence is being adduced
In State v. Williams, 98-1146 (La.App. 5 Cir. 6/1/99), 738 So.2d 640, writ denied, 1999-1984 (La.1/7/00), 752 So.2d 176, the jurors asked to view some testimony during their deliberations. The judge called the jury into the courtroom, and in the presence of defendant and the attorneys, addressed the jury’s question. The jurors returned to their deliberations. Within a matter of minutes, the jurors submitted a second question to the judge. In the presence of the attorneys and defendant, the judge read the question and what his answer to the jury would be. The judge then said he would go to the jury room to give the jurors his answer. Defense counsel stated he had no objection to that procedure. On appeal,. this court found that 11 ?.the trial court’s actions in re-instructing the jury out of the defendant’s presence did not constitute reversible error. This court reasoned that there was no evidence in the record of any prejudice to the defendant, and that the judge’s response to the jury request would have been the same if he had given it in open court with defendant and his counsel present. As was the case in Williams, defen *946 dant’s counsel in the instant case consented to his absence during the additional jury instructions. The record here does not show that defendant suffered any prejudice.
It is difficult to see what defendant’s presence would have added to the court’s re-instruction of the jury in this case. Defense counsel was present during the proceedings at issue, and was allowed input. At counsel’s request, the judge gave additional instruction on the lesser offense of manslaughter, something which could potentially have worked to defendant’s advantage. This assignment of error is without merit.
The record was reviewed for errors patent. LSA-C.Cr.P. art. 920; State v. Godejohn, 425 So.2d 750 (La.1983); State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990).
We note the trial judge failed to advise defendant of the prescriptive period for seeking post-conviction relief, as required by LSA-C.Cr.P. art. 930.8. As of September 18, 1997, the date of defendant’s sentencing, LSA-C.Cr.P. art. 930.8 allowed a defendant three years from the day his conviction and sentence became final within which to file an application for post-conviction relief. An amendment to Article 930.8, which became effective on August 15, 1999, shortens the prescriptive period from three years to two years. See 1999 La. Acts 1262. The amended article provides, in pertinent part:
A. No application for post-conviction relief, including applications which seek an out-of-time appeal, shall be | ^considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of Article 914 or 922, unless any of the following apply:
[[Image here]]
(3) The application would already be barred by the provisions of this Article, but the application is filed on or before October 1, 2001, and the date on which the application was filed is within three years after the judgment of conviction and sentence has become final.
The application of the amended prescriptive period in defendant’s case would not violate ex post facto prohibitions, as the article itself does not relate to an offense or its punishment. See State ex rel. Glover v. State, 93-2330, 94-2101, 94-2197 (La.9/5/95), 660 So.2d 1189, 1201. Therefore, we hereby order the district court to send written notice of the amended prescriptive period to defendant within ten days of the rendering of this opinion, then to file written proof in the record that defendant received said notice. State v. Stelly, 98-578 (La.App. 5 Cir. 12/16/98), 725 So.2d 562.
For the foregoing reasons, the defendant’s conviction and sentence are affirmed and this matter is remanded to the district court for the limited purpose of sending the defendant notice of the prescriptive period for seeking post conviction relief.

CONVICTION AND SENTENCE AFFIRMED; MATTER REMANDED.

. LSA-C.Cr.P. art. 772 provides, "The judge in the presence of the jury shall not comment upon the facts of the case, either by commenting upon or recapitulating the evidence, repeating the testimony of any witness, or giving an opinion as to what has been proved, not proved, or refuted.”

. LSA-C.E. art. 105 provides:
When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly. Failure to restrict-the evidence and instruct *945 the jury shall not constitute error absent a request to do so.