FREDERICKA HOMBERG WICKER, Judge.
12In this criminal proceeding, defendant appeals his convictions for second degree murder and conspiracy to commit aggravated burglary claiming that the evidence presented at trial was insufficient to support his convictions. Defendant further claims that the trial court impermissibly commented on the evidence and allowed unreliable expert testimony to be presented at trial. For the reasons discussed herein, we affirm defendant’s convictions and sentences.

Procedural Background

On September 2, 2010, a Jefferson Parish Grand Jury issued a superceding indictment charging defendant, Bryant Boudoin, with conspiracy to commit aggravated burglary in violation of La. R.S. 14:26:60 and second degree murder in violation of La. R.S. 14:30.1. The following day, defendant was arraigned and Upled not guilty to both charges. The matter proceeded to trial and, on January 19, 2011, a twelve-person jury returned a verdict of guilty as charged. Defendant filed a motion for new trial, which was denied by the trial court. On February 17, 2011, the trial court sentenced defendant to ten years at hard labor on the conspiracy conviction to run concurrently to a sentence of life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence on his second-degree murder conviction. This timely appeal follows.

Factual Background

The victim, Ms. Elizabeth McDaniel, was fatally beaten in her home during an aggravated burglary in the early morning hours of May 26, 2008. “Betsy” McDaniel had owned and operated Betsy’s Pancake House on Canal Street in New Orleans since its opening in 1996 and worked as a waitress six days a week from 5:30 a.m. until 2:00 p.m. Ms. McDaniel brought cash home from the restaurant daily and stored it in a large gun safe in her home. Ms. McDaniel lived next door to her daughter, Mrs. Mary Murdock, on War *1217 wick Drive in Marrero. Mrs. Murdock was the manager of Betsy’s Pancake House and worked with her mother at the restaurant daily. Mrs. Murdock has always been known as “Ladybug,” which is commonly known by her friends, family, neighbors, and restaurant customers. On the evening of Friday, May 28, 2008, Mrs. Murdock went outside to smoke a cigarette and let her dogs out; one of the dogs immediately ran to her mother’s backyard barking loudly.[1] Mrs. Murdock then heard a “thump,” which she thought sounded like someone jumping over her mother’s vinyl fence. She retreated inside to alert her husband.
|4Mr. Murdock immediately went outside with a flashlight and, through a gap in the fence[2], observed an intruder in the yard directly behind the victim’s backyard, hiding in a doghouse with only his feet visible. Mr. Murdock insisted that the individual leave. As the individual left the yard, Mr. Murdock shined a flashlight on him and later described him as a slim, young-looking black male with a long, narrow face. After Betsy McDaniel’s murder, Mr. Mur-dock saw a picture of the individual in the news, recognized him as the individual he had seen in his neighbor’s backyard, and contacted the police.[3]
On the evening of May 24, 2008 — the night after Mr. and Mrs. Murdock’s encounter with the backyard intruder — and into the early morning hours of May 25, 2008, the FBI conducted surveillance for drug trafficking at a residence, occupied by a William Donahue, down the street from the Murdocks’ and the victim’s homes. Special Agent Todd Schliem, one of the FBI agents who conducted the Donahue surveillance, noticed a suspicious vehicle passing through the neighborhood at 1:45 a.m. on May 25, 2008, that eventually parked for twenty minutes on Warwick Drive in the same block as the victim’s home. While parked, no one entered or exited the vehicle. The vehicle then moved three to five houses down and again parked for an unknown period of time— the vehicle remained parked at that location when the FBI terminated its surveillance for that evening.
Later that day, Sunday, May 25, 2008, the Murdocks hosted a crawfish boil at their home for family members, including Ms. McDaniel. Around 10:00 or 10:30 that night, Ms. McDaniel retired next door to her home for the evening as |fishe had to awaken at 4:00 a.m. each morning to open the restaurant. At approximately 4:10 a.m. on Monday, May 26, 2008, Mrs. Mur-dock telephoned her mother to awaken her, as she did every morning to ensure she would be ready to leave timely to open the restaurant. Ms. McDaniel answered the phone and told her daughter, “[e]ome see, somebody beat me up.” Mrs. Mur-dock and her husband rushed next door and found the victim in her bed with her *1218 eyes swollen shut and her bedroom ransacked. The victim told her daughter, “[t]hey just left” and “[t]hey almost killed me.” Mr. Murdock contacted the police and officers were dispatched to the scene at 4:21 a.m.
Deputy Thomas Gai of the Jefferson Parish Sheriffs Office was the first officer to arrive to the scene. Deputy Gai found the victim in her bed, incoherent and covered in blood. He noticed that the kitchen and living room area were “very immaculate” and that the victim’s bedroom and closet were heavily ransacked. He also noticed a large green safe in the rear of the residence in a small foyer area with pry marks along the side of the safe that appeared fresh. The rear door frame also had pry marks on it and the locking device in the door appeared to be installed backwards, allowing it to be easily accessed.
The victim was transported to the hospital, where officers attempted to obtain additional information about the incident. Deputy Darren Monie interviewed the victim at the hospital. The victim told Deputy Monie that someone came into her bedroom while she slept and awakened her with a flashlight shining in her face. The assailant pulled her out of bed, choking her and demanding that she open the safe. She attempted to run from the assailant to let her dogs in to attack him but was unable to do so before he regained control of her. The assailant again demanded that she open the safe; when she informed him that she did not have the combination to the safe because it belonged to her deceased husband, the | (¡assailant said to her, “we have Ladybug, and we’ll kill her if you don’t open the safe.”[4] The victim told Detective Monie that only family and friends refer to her as Ms. Betsy and to her daughter as Ladybug; she stated she then believed the assailant and told him that she had another safe she could open in her walk-in closet. She opened the safe and gave the assailant $5,000.00 in cash. The victim told Detective Monie that because of the beating and the effect of the flashlight to her eyes, she was unable to see the assailant. She described his voice and build, however, and stated that the assailant resembled both her neighbor Keith (a white male with a mustache and a goatee) and her ex-son-in-law (a white male with facial hair).[5] The victim also described the assailant to her daughter, stating that he “kind of looked like the man next door, Keith.”
Detectives Todd Rivere and Myron Gau-det also interviewed the victim in the hospital. The officers asked the victim for a description of the assailant, to which she responded, “like him,” pointing to Detective Gaudet and then touching her fingers to her face beneath her nose. Detective Gaudet is a white male, 5'9" or 5'10", clean shaven, bald, with an olive complexion and a medium, muscular build.[6] Detective Riv-ere testified that he planned to return to the hospital the following day to obtain *1219 more detailed information; Ms. McDaniel, however, died later that evening.
Detective Rivere, through the course of his investigation, learned that FBI agents reported a suspicious vehicle on the victim’s street a little over twenty-four hours before the victim’s attack. A photograph depicting the vehicle’s license plate 17number allowed detectives to determine that the vehicle’s registered owner was Ms. Martha Boudoin, defendant’s mother. On May 27, 2008, Detective Rivere met with Ms. Boudoin at her home; she informed him that the vehicle is registered in her name but that her son, Bryant Boudoin (defendant), is the primary driver. Detective Rivere spoke to the defendant at his home and questioned him about the presence of his vehicle on Warwick Drive, to which he responded that he was in the area to purchase marijuana. Defendant voluntarily went to the detective bureau where Detective Rivere and Sergeant Eddie Klien advised defendant of his rights and conducted a more formal interview.
Defendant told detectives that his friend, Jamil[7], informed him of a marijuana source, Jeff, in the Warwick Drive area. He stated that during the evening of May 24, 2008 into the early morning hours of May 25, 2008, he drove around the area waiting to meet Jeff and eventually met him on the next street over, Evans Street.[8] One month later, on June 25, 2008, defendant gave a recorded statement in the presence of his attorney.[9] In his second statement, defendant claimed that around 1:00 a.m. on May 26, 2008, he left his house in Algiers and went to the Sixth Ward area of New Orleans to meet a few friends. Around 2:00 a.m., defendant picked up his friend Brandon Moore from Lafreniere Street in the Seventh Ward area of New Orleans.[10] Then, roughly between 8:00 and 3:30 a.m., they stopped at Melvin’s Bar on St. Claude Avenue and Frenchmen Street in New Orleans, where defendant went in alone and bought a glass of Hennessy from a white female bartender with brownish hair.[11]
|sMr. Scott Hoerner, the manager and co-owner of Melvin’s Bar, testified that he employed a white female bartender with brown hair, Ms. Julie Ann Lewis, who worked from 7:00 p.m. on May 25, 2008, until 6:47 a.m. on May 26, 2008. The business records of the bar reflect that Ms. Lewis only rung up one Hennessy drink during her shift, at 4:18 a.m. on the morning of May 26, 2008.
Mr. Randall Paisant, the former Assistant Executive Director for the Crescent City Connection Division of the Louisiana Department of Transportation and Development, testified that his records indicate that one of the two toll tags issued to the Boudoin family crossed from the West Bank to the East Bank at 11:31 p.m. on May 25, 2008, and again at 3:46 a.m. on May 26, 2008.[12]
*1220 Following his initial interview, defendant voluntarily allowed detectives to search his 2004 Toyota Camry. In the trunk of defendant’s vehicle, detectives found and removed a black pry bar tool that Detective Rivere testified “had some of the characteristics of what I observed from the crime scene.” Defendant admitted ownership of the tool and stated that he used it to remove molding at his grandmother’s house. At trial, defendant testified that he also used the tool to remove a hubcap and fix a flat tire.[13] Defendant further testified that the tool never left his possession during the Memorial Day weekend of Friday, May 23, 2008, through Monday, May 26, 2008.
The tool was submitted for various testing. Mr. David Caruso, an expert in the field of forensic polymer and paint analysis, examined the pry bar and paint chips from the green safe and wooden door frame of the victim’s home. Mr. Caruso determined that paint smears on the pry bar were consistent with the paint 19on the green safe removed from the victim’s home. He concluded that the paint layers from the safe and from the pry bar “were like one another with respect to color, binder characteristics and pigment characteristics.” Mr. Caruso also compared a separate white paint smear on the pry bar with the white paint on the rear doorframe of the victim’s home. He concluded that the paint on the pry bar was inconsistent with the paint from the doorframe.
Ms. Louise Waltzer, an expert in the field of tool marks and firearms identification, concluded that the pry bar recovered from defendant’s trunk was the tool used to create the marks found on the rear door strike plate and the green safe in the victim’s home. She testified that the matches are “remarkable” and that her “confidence level is one-hundred percent.” [14]
Dr. Karen Ross, an expert in the field of forensic pathology, testified that the victim’s injuries on her hands and arms were consistent with defensive type wounds. Dr. Ross explained that, based on the victim’s injuries, an object “with a relatively sharp edge, but still blunt” was likely used. She also opined that the pry bar recovered from defendant’s trunk is the type of instrument that could cause the victim’s injuries. In her opinion, the injuries sustained from the beating caused the victim’s death.

Discussion

We will first consider defendant’s claim that the evidence at trial was not sufficient to support his convictions. When the issues on appeal pertain to both sufficiency of the evidence and one or more trial errors, the reviewing court should 110firat determine the sufficiency of the evidence. State v. Hearold, 603 So.2d 731, 734 (La.1992).
The standard of review for the sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any ra *1221 tional trier of fact could conclude that the state proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); and State v. King, 06-554 (La.App. 5 Cir. 1/16/07), 951 So.2d 384, 390, writ denied, 07-0371 (La.5/4/07), 956 So.2d 600.
An appellate court’s primary function is not to redetermine the defendant’s guilt or innocence in accordance with its appreciation of the facts and credibility of the witnesses. Rather, our function is to review the evidence in the light most favorable to the prosecution and determine whether there is sufficient evidence to support the jury’s conclusion. State v. Banford, 94-883 (La.App. 5 Cir. 3/15/95), 653 So.2d 671, 677.
Evidence may be direct or circumstantial. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact can be inferred according to reason and common experience. State v. Williams, 05-59 (La.App. 5 Cir. 5/31/05), 904 So.2d 830, 833. All evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. State v. Wooten, 99-181 (La.App. 5 Cir. 6/1/99), 738 So.2d 672, 675, writ denied, 99-2057 (La.1/14/00), 753 So.2d 208.
Defendant was charged and convicted of conspiracy to commit aggravated burglary in violation of La. R.S. 14:26:60 (count one) and second degree murder in violation of La. R.S. 14:30.1 (count two). It is the theory of the state’s case that | n defendant and an unknown white assailant conspired to burglarize Ms. McDaniel’s home and, in carrying out that burglary, the unknown white assailant brutally beat Ms. McDaniel, causing her death.

Conspiracy to Commit Aggravated Burglary

La. R.S. 14:60 defines aggravated burglary as follows:
Aggravated burglary is the unauthorized entering of any inhabited dwelling, or of any structure, water craft, or movable where a person is present, with the intent to commit a felony or any theft therein, if the offender,
(1) Is armed with a dangerous weapon; or
(2) After entering arms himself with a dangerous weapon; or
(3) Commits a battery upon any person while in such place, or in entering or leaving such place.
La. R.S. 14:26(A) defines criminal conspiracy as:
The agreement or combination of two or more persons for the specific purpose of committing any crime; provided that an agreement or combination to commit a crime shall not amount to a criminal conspiracy unless, in addition to such agreement or combination, one or more of such parties does an act in furtherance of the object of the agreement or combination.
The elements of the crime of conspiracy are: (1) an agreement or combination of two or more persons for the specific purpose of committing a crime, plus (2) an act done in furtherance of the object of the agreement or combination. State v. Tatum, 09-1004 (La.App. 5 Cir. 5/25/10), 40 So.3d 1082, 1089. If the intended basic crime has been consummated, the conspirators may be tried for either the conspiracy or the completed offense, and a conviction for one shall not bar prosecution for the other. State v. Grace, 2010-1222 (La.App. 3 Cir. 4/6/11), 61 So.3d 812, 818, writ denied, 2011-0961 (La.10/21/11), 73 So.3d 382. A criminal defendant can be convict *1222 ed of conspiring with anyone. The co-conspirator’s identity need not be known. Rogers v. United States, 340 U.S. 367, 375, 71 S.Ct. 438, 443, 95 L.Ed. 344 (1951); and United States v. Winn, 948 F.2d 145, 157 (5th Cir.1991).
The first element of conspiracy requires specific intent which is defined in La. R.S. 14:10 as that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. Intent may be inferred from the circumstances of the transaction and the actions of the defendant. State v. Jackson, 00-221 (La.App. 5 Cir. 3/15/01), 783 So.2d 482, 487, writ denied, 2001-1071 (La.5/9/03), 843 So.2d 385.
In this case, the defense does not dispute that an aggravated burglary occurred. Rather, defendant argues that the state did not prove beyond a reasonable doubt that defendant entered into an agreement with another person for the specific purpose of committing aggravated burglary of the victim’s home. Defendant asserts that the evidence presented at trial does not prove that two people committed the crime or that defendant participated in the crime. Defendant points out that there is no evidence connecting him to the unknown white male assailant or proving that he entered into an agreement with an unknown white male. Further, defendant asserts that his presence in the area of the victim’s home prior to the burglary does not prove that he had an agreement with an unknown white male to commit aggravated burglary. The state responds that the evidence presented at trial demonstrates that two persons conspired to commit aggravated burglary of the victim’s home and that defendant participated in the burglary.
The testimony presented at trial reflects that although the victim described the assailant who physically attacked her as a white male, she also made statements indicating that two or more people were involved in the crime. Mrs. Murdock, the victim’s daughter, was the first person to speak to the victim following the attack. |iaMrs. Murdock testified that when she arrived to her mother’s home the morning of the crime, her mother informed her, “[t]hey just left.” The victim told her daughter, “[t]hey grabbed me by the hair and sat me up” and “they told me they had you [her daughter] and were going to hurt you.” Before the victim was transported to the hospital, she told her daughter, “[t]hey almost killed me.”
Deputy Gai, the first deputy to report to the scene, however, testified that the victim never indicated to him that more than one suspect was involved in the crime. Deputy Gai testified that his report of the crime indicates that the victim informed him the suspect demanded, “[i]f you don’t open the safe, I’m going to kill Ladybug.” Captain Thornton, with the homicide division of the Jefferson Parish Sheriffs Office, acknowledged that Deputy Gai’s written report indicates a singular assailant. However, Captain Thornton testified that his investigation indicated that, although the victim relayed very limited information, she did relay to detectives that “plural” suspects were involved in the crime.
Detective Monie testified that he learned from his interview with the victim that the assailant who attacked her stated, “we have Ladybug, and we’ll kill her if you don’t open the safe.” Further, Detective Rivere testified that based on his experience and investigation in the burglary division of the Jefferson Parish Sheriffs Office, he is “absolutely” certain that more than one individual committed this crime. Detective Rivere testified that, “[i]n my eighteen years of experience I have never seen a situation where one person, one *1223 single soul, perpetrator is allowed to do this and still create so much ransacking inside of an area.”
When the trier-of-fact is confronted with conflicting testimony, fact - findings rest solely with that judge or jury, who may accept or reject, in whole or in part, any witness’s testimony. State v. Hernandez, 11-146 (La.App. 5 Cir. 11/29/11), 82 So.3d 327, 332. Based upon the testimony and evidence presented at trial, the jury could have reasonably concluded that two perpetrators committed aggravated burglary of the victim’s home.
To prove defendant’s identification and participation in the crime, the state presented the testimony of Mr. John Murdock who identified defendant at trial and testified that defendant was in and around the victim’s backyard without explanation on the evening of May 23, 2008. Further, Special Agent Todd Schliem with the FBI testified that defendant’s vehicle was suspiciously parked near the victim’s home in the early morning hours of May 25, 2008, approximately 24 hours before the burglary. The state asserts this evidence supports a finding that defendant was “casing” the victim’s home.[15]
Lastly, and most importantly, the state presented expert testimony and evidence to prove that defendant was in possession of the pry bar used in the victim’s home during the commission of the offense.[16] David Caruso, an expert in the field of forensic polymer and paint analysis, testified that paint smears present on the pry bar found in defendant’s vehicle were consistent with the green paint found on the green safe from the victim’s home. Ms. Louis Waltzer, an expert in the field of tool mark identification, testified that she examined, on a microscopic level, the pry bar removed from the defendant’s vehicle, the safe removed from the victim’s home, and the strike plate removed from the rear door of the victim’s home. Ms. Waltzer described the process used in her analysis; she testified that she used Mikrosil, a soft putty material, which she applied to the safe, the strike |lspIate, and the pry bar, along with a hardener, to create an identical putty mold of the markings imparted on each of the items. She testified that she then microscopically compared the markings on each item to look for repeated impressions[17] and striations.[18] Upon her examination, Ms. Waltzer concluded that she is “one-hundred percent” confident that the pry bar found in defendant’s vehicle is the tool that was used to impart the markings she examined on the safe and strike plate removed from the victim’s *1224 home. Defendant testified that the pry-bar found in his vehicle never left his possession during Memorial Day weekend 2008.
The jury chose to accept the state’s theory of the case — that two persons conspired to commit aggravated burglary of the victim’s home and that defendant in fact conspired and participated in the burglary. When the trier-of-fact is confronted with conflicting testimony, fact findings rest solely with that judge or jury, who may accept or reject, in whole or in part, any witness’s testimony. State v. Hernandez, 11-146 (La.App. 5 Cir. 11/29/11), 82 So.3d 327, 332. The jury heard testimony from all the witnesses, reviewed all the evidence, and concluded that defendant conspired with the unknown white male to commit an aggravated burglary of the victim’s home. We find the evidence presented at trial is sufficient to support the jury’s conclusion.

Second Degree Murder

Second degree murder is defined by La. R.S. 14:30.1(A)(2) as the killing of a human being when the offender is engaged in the perpetration or attempted perpetration of one of several enumerated felonies, including aggravated burglary. State v. Lewis, 05-170 (La.App. 5 Cir. 11/29/05), 917 So.2d 583, 589-90, writ denied, 06-0757 (La.12/15/06), 944 So.2d 1277. The law of principals states that all persons involved in the commission of a crime are equally culpable. See La. R.S. 14:24 and State v. Hampton, 98-0331 (La.4/23/99), 750 So.2d 867, 880. Principals are defined as “all persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime.” La. R.S. 14:24. Thus, one need not possess specific intent to kill or inflict great bodily harm to be a principal to second degree felony murder. State v. Gurganus, 03-992 (La.App. 5 Cir. 12/30/03), 864 So.2d 771, 775, writ denied, 04-0254 (La.6/4/04), 876 So.2d 75. Rather, under the felony murder doctrine, the state need only prove the commission of the underlying felony or the attempt thereof. Lewis, 05-170 (La.App. 5 Cir. 11/29/05), 917 So.2d at 590.
In this case, as discussed above, the evidence is sufficient to support the jury’s conclusion that defendant, along with an unknown accomplice, entered the victim’s home with the intent to commit a burglary. Once inside, the unknown accomplice fatally beat the victim. The state presented the testimony of Dr. Karen Ross, a forensic pathologist, who performed the autopsy of the victim and concluded that the injuries received from the beating during the aggravated burglary caused the victim’s death. Even though defendant may not have inflicted the injuries to the victim which later resulted in her death, the evidence still supports a conviction of second degree murder under the felony murder doctrine. See State v. Cedrington, 98-253 (La.App. 5 Cir. 12/16/98), 725 So.2d 565, 576, writ denied, 99-0431 (La.6/25/99), 745 So.2d 1182.
We find the evidence sufficient to support defendant’s convictions. This assignment of error is without merit.
|17In his next assignment of error, defendant claims that the trial court erred in allowing the expert testimony of Louise Waltzer and David Caruso, claiming that the testimony should have been excluded as “junk science.” The state responds that these claims have no merit and that the trial court properly accepted the expert testimony.
As a general matter, under La. C.E. art. 702, “if scientific, technical, or other specialized knowledge will assist the trier of *1225 fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify ... in the form of an opinion or otherwise.” State v. Mosley, 08-1318 (La.App. 5 Cir. 5/12/09), 18 So.3d 705, 714 writ denied, 2009-1316 (La.3/5/10), 28 So.3d 1002; and State v. Higgins, 03-1980 (La.4/1/05), 898 So.2d 1219, 1239, cert. denied, Higgins v. Louisiana, 546 U.S. 883, 126 S.Ct. 182, 163 L.Ed.2d 187 (2005).
In State v. Foret, 628 So.2d 1116 (La.1993), the Louisiana Supreme Court adopted the test set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), regarding proper standards for the admissibility of expert testimony which requires the trial court to act in a gatekeep-ing function to ensure that any and all scientific testimony or evidence admitted is not only relevant, but rehable. State v. Chauvin, 02-1188 (La.5/20/03), 846 So.2d 697, 700-701. To assist the trial courts in their preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and can properly be applied to the facts at issue, the Supreme Court suggested the following general observations are appropriate: 1) whether the theory or technique can be and has been tested; 2) whether the theory or technique has been subjected to peer review and publication; 3) the known or potential rate of error; and 4) whether the methodology is generally accepted by the relevant [^scientific community. Daubert, 509 U.S. at 592-594, 113 S.Ct. 2786. Daubert’s general “gatekeeping” applies not only to testimony based upon scientific knowledge, but also to testimony based on “technical” and “other specialized knowledge.” Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 142, 119 S.Ct. 1167, 1171, 143 L.Ed.2d 238 (1999); and Independent Fire Ins. Co. v. Sunbeam Corp., 99-2181 (La.2/29/00), 755 So.2d 226.
The trial court may consider one or more of the four Daubert factors, but that list of factors neither necessarily nor exclusively applies to all experts or in every case. Kumho Tire Co., Ltd., 526 U.S. at 142, 119 S.Ct. 1167. Rather, the law grants a district court “the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination.” Id.
On October 13, 2009, the trial court conducted a Daubert hearing, considered the law, and found that the testimony presented by David Caruso and Louise Waltzer “is scientific and is admissible and is relevant and is reliable.” Defense counsel did not object to the trial court’s Dau-bert hearing ruling accepting David Caruso as an expert in forensic polymer and paint analysis and further stipulated to Louise Waltzer’s expertise in tool mark analysis. After the defense’s stipulation, the state specifically put on the record that it would not present any additional information “as to Mrs. Waltzer’s qualifications and whether or not this is, in fact, scientific testimony” in light of the defense’s stipulation.
At trial, the trial court accepted David Caruso as an expert in forensic polymer and paint analysis. Defense counsel again did not object to David Caruso’s testimony and when questioned by the trial judge if there was any objection to Mr. Caruso’s testimony, counsel stated, “[t]here isn’t Your Honor.”
The failure to raise an objection to the admissibility and reliability of an expert’s testimony constitutes a waiver of such an objection. State v. Perry, 08-304 (La.App. 3 Cir. 5/6/09), 9 So.3d 342, 349; and Everhardt v. Louisiana Dept. of Transp. & Dev., 07-0981 (La.App. 4 Cir. 2/20/08), 978 So.2d 1036, 1046. A contem *1226 poraneous objection must be made to the disputed evidence or testimony in the trial court record to preserve the issue for appellate review. See La. C.E. art. 108 and La.C.Cr.P. art. 841. We find that, as to David Caruso’s testimony, defendant has waived any objection to his testimony and we decline to review this issue on appeal.
The trial court accepted Louise Waltzer as an expert in tool mark and firearms identification. Although defense counsel stipulated to Ms. Waltzer’s qualifications at the Daubert hearing, counsel objected to her testimony at trial. We find that defense counsel adequately preserved this issue for appeal.
Louise Waltzer is retired from the Jefferson Parish Crime Laboratory, where she worked in crime analysis from 1976 to 2008. Ms. Waltzer worked in the crime laboratory while attending school, where she received a degree in Biology with a minor in Chemistry. She is the past president of the international Association of Firearm and Tool Mark Examiners and the Louisiana Association of Forensic Scientists. She began testifying as an expert in the field of tool mark analysis and firearms identification in 1980 and has testified as an expert in both federal and Louisiana state courts.
Defendant concedes that Ms. Waltzer is qualified as an expert in firearms analysis, but challenges her qualifications to testify in this case on the grounds that she has never examined a pry bar nor qualified as an expert in a case involving a pry bar. At the Daubert hearing, Ms. Waltzer testified that “[fjirearms [analysis] is a subset of tool mark [analysis]. It’s all the study of markings left on certain objects. Something harder will mark something softer. So, it’s a study of these microscopic markings to find a common origin, or eliminate a common origin.” |2qMs. Waltzer acknowledged that she has never examined nor testified in a case involving a pry bar imparting marks onto a safe. However, she stated that she has examined other tools, such as bolt cutters and an axe, to determine if they have imparted marks onto a metal object similar to a safe, such as a file cabinet. Ms. Waltzer testified that she has previously been accepted as an expert in tool mark analysis in Plaque-mines Parish in a case involving an axe imparting marks onto a copper wire.
The trial judge is vested with wide discretion in reviewing an expert’s qualifications. “Competence of an expert witness is a question of fact to be determined within the sound discretion of the trial judge; h[er] rulings on the qualifications of expert witnesses will not be disturbed in the absence of manifest error.” State v. Higgins, 2003-1980 (La.4/1/05), 898 So.2d 1219, 1239-40 (citing State v. Drew, 360 So.2d 500 (La.1978)); see also State v. Mosley, 08-1318 (La.App. 5 Cir. 5/12/09), 13 So.3d 705, 714, writ denied, 2009-1316 (La.3/5/10), 28 So.3d 1002. Given Ms. Waltzer’s extensive experience and training of over thirty years in the field of tool mark examination, we find the trial judge did not abuse his discretion in accepting Ms. Waltzer as an expert in tool mark identification. This assignment of error is without merit.
In his final assignment of error, defendant claims that the trial court made impermissible comments on the evidence during the jury charges and thus deprived defendant of his right to a fair trial. Specifically, defendant complains that the trial court repeatedly read a portion of the su-perceding indictment — the “Overt Acts”— as if the allegations should be accepted as proven facts.
Defendant did not make a contemporaneous objection to the trial court’s reading of the overt acts contained in the indict *1227 ment. Rather, the record reflects that defense counsel specifically requested that the trial judge repeat the overt acts 121 after advising the jury of the elements of each charged offense and responsive verdict. The trial judge commented, out of the presence of the jury, that defense counsel’s request was unusual; the trial judge then noted that neither party had an objection to the reading of the overt acts following the instructions on each charged offense and responsive verdict. However, this Court has found that, despite the lack of a contemporaneous objection, we may consider the issue of whether a trial judge’s reading of the indictment to the jury constituted an improper comment on the evidence. See State v. Simmons, 99-93 (La.App. 5 Cir. 4/12/00), 759 So.2d 940, 943.
It is the duty of the trial judge to abstain from any expression of opinion or comment on the facts of the evidence. See State v. Williams, 375 So.2d 1379, 1381 (La.1979); La.C.Cr.P. art. 772; and La. C.Cr.P. art. 806. The no-judge-comment rule is designed to safeguard the role of the jury as the sole judge of the facts on the issue of guilt or innocence. Williams, 375 So.2d at 1381. Thus, if the effect of a question or comment is to permit a reasonable inference that implies the trial judge’s opinion as to the defendant’s innocence or guilt, this constitutes a violation of defendant’s statutory right and thus requires reversal. Id.
In the instant case, the “Overt Acts” read to the jury were taken directly from defendant’s superseding indictment and set forth in the jury instructions as follows:
(1) On or about May 23rd, in the parish of Jefferson, during the evening hours a black male later identified as the defendant, Bryant Boudoin was observed by a neighboring resident looking over the rear fence of the residence of Elizabeth McDaniel at 5236 Warwick Drive in Marrero, Parish of Jefferson State of Louisiana.
(2) On Saturday, May 24th, 2008 in the Parish of Jefferson, during the evening hours a gray 2004 Toyota Camry bearing Louisiana license plate number KJT 6889 operated on that occasion by the defendant, Bryant Boudoin and registered to the defendant’s mother Martha Boudoin of 3204 Potomac Street in New Orleans, was observed parked in front the residence of Elizabeth McDaniel at 5236 Warwick Drive, Parish of Jefferson.
| ¾¾(3) On or about May 25th, 2008 after approximately 10:30 p.m. an unknown white male gained forcible and unauthorized entry through the rear door of the McDaniel residence at the above address by the use of a pry bar.
(4). On the same date and at the same time the pry bar which was used to enter the home unlawfully was also used in the attempt to pry open a Remington gun safe which was located in the laundry area at the rear of the victim’s home.
(5) During the late evening hours of May 25th and the very early morning hours of May 26th, at the above described location, Elizabeth McDaniel was severely and mortally beaten by the unknown white male and the defendant, Bryant Boudoin, as a co-conspirator and a principal to all criminal acts thus far described herein, which beating also involved the use and effect of blunt force trauma.
(6) On or about May 27th, 2008 the gray 2004 Toyota Camry, described in Over Act No. 2 was located at the residence of the registered owner, Martha Boudoin of 3204 Potomac Street, New Orleans. At that time investigators learned that the defendant, Bryant Bou- *1228 doin was the primary driver of that vehicle.
(7) On that same date a search was conducted of the trunk of the vehicle above described and the pry bar mentioned in Overt Acts 3, 4, and 5 was found.
Following each reading of the overt acts from the superceding indictment, the trial judge stated the following:
All acts heretofore described in this Superseding Indictment constitute violation of Louisiana Revised Statute 14:26 Conspiracy to commit aggravated burglary and were committed in the Parish of Jefferson.
Defendant argues that the trial judge essentially commented on the evidence in the case and indicated that the overt acts were proven facts, rather than allegations contained in the superceding indictment. Defendant suggests that the repeated reading of the overt acts in this case is comparable to the jury charge in State v. Colligan, where the Third Circuit Court of Appeal reversed the defendant’s conviction based on the following jury charge:
12,-jThe defendant is charged with molestation of a juvenile. John W. Colligan, at the Parish of Evangeline on or about the 23rd day of July, 1993 did willfully and unlawfully violate Revised Statutes 14:81.2 relative to molestation of a juvenile in that being over the age of 17 years did commit the lewd and lascivious act of molestation upon the person of [A.F.], and in the presence of [A.F.], a child under the age of 17 years with the intent of arousing or gratifying the sexual desires of himself or and/or the said child by the use of influence by virtue of a position of control or supervision over the child.
State v. Colligan, 95-880 (La.App. 3 Cir. 8/7/96), 679 So.2d 184, 189-190. In reversing the defendant’s conviction, the reviewing court found:
In this case, the trial judge informed the jury that the defendant was guilty. The state contends that the judge was merely reading the bill of information to the jury, that this was clear to the jury, and that the jury was not misled. While the trial judge’s action can be interpreted as the state suggests, we cannot agree that such an interpretation is the only reasonable interpretation to a jury. At no time did the trial judge inform the jury that he was only reading the bill of information to them.

Id.

Unlike the trial court’s instructions in Colligan, the trial judge in this case informed the jury — each time he read the overt acts per defense counsel’s request— that the overt acts described originated from the superceding indictment. The record reflects that, after jury selection but prior to commencement of trial, the minute clerk read the entirety of the su-perceding indictment, including the overt acts, to the jury. Further, the trial judge subsequently instructed the jury, “[a]n indictment is a written, formal accusation against a defendant charging the defendant with a crime. You are not to consider the indictment as evidence against the defendant. The filing of an indictment creates no inference whatsoever that the defendant is guilty.” Moreover, the trial judge also informed the jury, “[i]f I have given you the impression that I have an opinion concerning the guilt or innocence of the defendant, you are to disregard that impression.”
|24We find the trial judge did not imper-missibly comment on the evidence and that the judge’s reading of the charged offense did not affect the jury’s verdict. Accordingly, this assignment is without merit.

*1229
Errors Patent

We have reviewed the record for errors patent in accordance with La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 387 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). Our review reveals no errors patent.

Conclusion

We find that defendant’s assignments of error are without merit. Accordingly, for the reasons stated herein, defendant’s convictions and sentences are affirmed.

AFFIRMED

. There is no fence separating Mrs. Mur-dock’s backyard from her mother’s (the victim's) backyard.

. At trial, the state presented testimony that a "gap” or "aperture” in the fence permitted Mr. Murdock to view into the yard directly behind the victim’s yard. At trial, defense counsel stipulated that there was in fact a gap in the fence but argued that hedges obstructed Mr. Murdock’s view. At trial, Mr. Mur-dock testified that his view was not obstructed.

.When presented with photographic lineups, Mr. Murdock was not able to identify anyone; however, Mr. Murdock testified that the photos provided in the photographic lineups were not good quality and that he is certain that the person he identified in the photo from the news is the individual he saw in his neighbor’s yard. At trial, Mr. Murdock identified defendant as the individual he saw in his neighbor’s backyard on May 23, 2008.

. There is conflicting testimony in the record as to whether the assailant told the victim "we have Ladybug” or "I have Ladybug.” This inconsistency is set forth infra in our discussion of defendant's first assignment of error concerning the sufficiency of the evidence.

. Testimony at trial reflects that officers interviewed these individuals, who established verifiable alibis and are not suspects in this case.

.Detective Rivere testified that the victim, "put her right hand, her two fingers-she lift up; she put her hand under her nose. And she did this twice.” (indicating a hand movement of her fingers under her nose). The testimony indicates that the victim may have intended to show that the perpetrator resembled Detective Gaudet but also had a mustache or facial hair.

. “Jamil” is also referred to as "Jamel" in the record. Defendant’s trial testimony reveals that Jamil’s real name is Darrence Robinson. The testimony also reflects that Jamil is defendant’s cousin.

. Detective Rivere and Captain Dennis Thornton investigated defendant’s claims that he purchased marijuana on Evans Street on May 25, 2008, but were not able to confirm that the transaction actually took place.

. This recorded statement was published to the jury.

. At trial, defendant testified that he picked up Brandon Moore after 3:00 a.m.

. At trial, defendant testified that he did not arrive to Melvin's bar until after 4:00 a.m.

. Papillon Anderson, a licensed Louisiana investigator, testified at trial that he conducted tests to determine the distance between the *1220 victim's home and the toll tag booth. He tested the distance on three different occasions and confirmed an average time of 8 min., 29 seconds to drive from the victim’s home to the toll tag booth.

. This testimony was corroborated by Mr. Alcide Washington, who testified that he previously helped defendant change a flat tire and that defendant used "a little bar” to remove the hubcap.

. Colonel Timothy Scanlan, the Crime Lab Director of the Jefferson Parish Sheriff's Office and an expert in the fields of tool mark and firearms examination as well as crime scene reconstruction, reviewed Ms. Waltzer’s analysis and agreed with her conclusions. He too concluded that the piy bar recovered from defendant's vehicle created the marks left on the rear door strike plate and safe from the victim’s home.

.To further support its theory that the burglary was planned, the state points to the testimony of Sergeant Chad Pitfield, an expert in the field of latent print examination and identification, who testified that some of the fingerprints obtained from the scene indicated that the perpetrator(s) wore gloves. Sergeant Pitfield further testified that some of the fingerprints lifted from the scene were not of sufficient quality to undergo a comparative analysis and the ones that were sufficient did not reveal a match with defendant. Sergeant Pitfield stated that the fingerprints lifted could be those of the victim; however, he stated that the fingerprints taken from the victim’s autopsy were not of sufficient quality to use for comparison.

. The testimony and qualifications of these experts are examined in our discussion of defendant's second assignment of error, infra.

. Ms. Waltzer explained an impression as "marks produced when a tool is played against another object, and there is enough force applied by the tool, so that [it] leaves an impression."

. Ms. Waltzer explained striations as "contour variations generally microscopic on the surface of an object caused by a combination of force and motion approximately parallel to the plane being marked.”