STATE OF LOUISIANA

VERSUS

SETH REDELL

NO. 22-KA-457

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 16-2841, DIVISION "D"
HONORABLE SCOTT U. SCHLEGEL, JUDGE PRESIDING

April 26, 2023

**CORNELIUS E. REGAN**
**JUDGE, PRO TEMPORE**

Panel composed of Judges Jude G. Gravois,
Stephen J. Windhorst, and Cornelius E. Regan, Pro Tempore

**AFFIRMED**
    **CER**
    **JGG**
    **SJW**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Jalisa Walker
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
      Honorable Paul D. Connick, Jr.
      Thomas J. Butler
      Darren A. Allemand
      Jennifer C. Voss
      Matthew Whitworth

COUNSEL FOR DEFENDANT/APPELLANT,
SETH REDELL
      Roger W. Jordan, Jr.
      James A. Williams

**REGAN, J.**

Defendant, Seth Redell, was charged by grand jury indictment with the second degree murder of a known juvenile, date of birth 7/19/2014, in violation of La. R.S. 14:30.1. He pled not guilty at arraignment. At the conclusion of trial on May 6, 2022, a twelve-person jury unanimously found defendant guilty of the responsive verdict of negligent homicide. On May 11, 2022, the trial court sentenced defendant to five years in the Department of Corrections, without benefit of parole, probation, or suspension of sentence, and imposed a $5,000 fine. Defendant appeals. For the following reasons, we affirm.

## FACTS

This case involves the death of H.U.,[1] the twenty-one-month old son of Julienne Frederico, who was defendant's girlfriend. At trial, Jessica Burkhardt, a paramedic, testified that on the morning of April 24, 2016, she and her partner were dispatched to a call for service at 601 Allo Avenue in Marrero. When they arrived, they were uncertain where to go because no one met them outside or flagged them down, which was unusual. After several minutes, defendant exited the house carrying a child who was cold, wet, limp, and unresponsive, but still had a pulse. Ms. Burkhardt testified that the child had a right-sided gaze, which meant looking off in one direction with the eyes not moving. She provided that this was typically indicative of head trauma or a significant head bleed. According to Ms. Burkhardt, defendant told them that he placed the child in a cold bath in an effort to awaken him. H.U. was transported to University Medical Center ("UMC").

Deputy Nathaniel Obiol of the Jefferson Parish Sheriff's Office ("JPSO") testified that on April 24, 2016, he was dispatched to Allo Street regarding a child

---

[1] Although La. R.S. 46:1844(W)(1)(a) allows the use of a juvenile crime victim's name when the crime results in the death of the victim, we use the victim's initials under the authority of La. R.S. 46:1842(3)(a) and La. R.S. 46:1844(W)(3), which allow this Court to identify a homicide victim who is also a minor by using his or her initials. *See State v. Becnel*, 17-591 (La. App. 5 Cir. 6/27/18), 250 So.3d 1207, n. 1.

who had fallen down the stairs. When he arrived, he came into contact with defendant, who was pacing back and forth and appeared nervous. Deputy Obiol asserted that when he asked what happened, defendant responded that his girlfriend's child had fallen down the stone stairs near the rear of the residence. Defendant told him that he had returned home from dropping off the child's mother at the airport and was making breakfast when he heard the dog run inside the kitchen towards the back door, after which he heard the child whimper. Defendant said when he turned around, he saw H.U. lying face down at the base of the stairs. Deputy Obiol testified that defendant also told him he brought the child inside and put him under cold water in the bathroom. According to Deputy Obiol, he gave defendant updates on H.U.'s condition, but defendant never asked about the child and seemed unconcerned about how he was doing.

Detective Gabriel Faucetta of the JPSO testified that on April 24, 2016, he went to 601 Allo Street at approximately noon and saw defendant in the back of a patrol car. He obtained a search warrant for defendant's residence and took pictures of the house. He also seized defendant's cell phone. Later at the detective bureau, Detective Faucetta took defendant's statement.

In his statement, defendant said that he and H.U. arrived home after dropping Ms. Frederico off at the airport and H.U. was fussy, so he brought him into his room to change his diaper. He stated that H.U. started throwing a fit, so he brought the child into the kitchen and let him run around instead of putting him in his high chair. He explained that the back door was open because the dog went in and out all of the time. Defendant claimed that he then heard sounds, after which he got up and saw H.U. lying face down at the bottom of the steps. Defendant stated that he brought H.U. into the bathroom and held him under water in the shower to awaken him, but it did not work. He provided that the child was getting worse, and he saw mucus and "stuff" come out of his mouth and nose. Defendant

called his father, who told him to call 9-1-1, but he asked his father to call because he was taking care of H.U. Thereafter, he received a call indicating that EMS was outside, so he took H.U. outside and gave him to EMS.

While defendant was giving his statement, Detective Donald Zanotelli entered the interrogation room and told defendant that a fall down the stairs was not consistent with the injuries the child sustained, according to the neurologist. Defendant then stated that H.U. was throwing himself around in his room that morning. He denied shaking or abusing him or losing his temper. Detective Faucetta provided that defendant was arrested for cruelty to a juvenile.

Detective Faucetta testified that he and Detective Zanotelli went to the hospital, met with the child's mother, and learned that H.U. was brain dead. They also learned from Ms. Frederico that defendant said H.U. broke his necklace that morning. Detective Faucetta obtained a second search warrant for defendant's residence where he found a broken necklace.

Detective Zanotelli of the JPSO testified that he was the lead investigator in this case. He requested that defendant's phone be extracted by the digital forensics unit, and he prepared a timeline of the case. According to Detective Zanotelli, the timeline showed that on the morning of April 24, 2016, defendant and Ms. Frederico sent several text messages to each other after Ms. Frederico arrived at the airport. Detective Zanotelli testified that at 8:05:43, defendant sent Ms. Frederico a Facebook message that said, "H.U. just broke the f*cking chain you got me." He said that at 8:05:52, defendant called Ms. Frederico, and that at 8:13 a.m., Ms. Frederico sent defendant a Facebook message saying that they would get it fixed and that H.U. needed him because she just left. Detective Zanotelli testified that Ms. Frederico texted defendant two more times at 8:13, and that at 8:15, defendant called Stephen Hayes. He further testified that defendant called his father at 8:17:16, and defendant's mother called 9-1-1 at 8:18:49 to report that

the child had fallen down the stairs. At 8:20 a.m., the JPSO and EMS were dispatched to 601 Allo Street.

Dr. Jennifer Mooney testified that on April 24, 2016, she was the attending trauma surgeon at UMC when H.U. was brought in. Dr. Mooney stated that H.U. initially made some crying noises but eventually stopped. She also stated that the child was breathing on his own but as time progressed, he began to "posture," which she explained was one level above doing nothing on the Glasgow Coma Scale. Dr. Mooney asserted that this was an indicator of severe brain injury and noted that the only external injury they saw was a bruise on his forehead. She further asserted that she spoke with EMS who relayed that the child either fell or was pushed by a dog down three stairs on an outside porch onto concrete.

Dr. Mooney testified that she obtained a CT scan and that H.U.'s injuries were inconsistent with the story that was being told. Dr. Mooney found the injuries to be very suspicious and not the result of accidental trauma. She also found it suspicious that there was a delay in time from the incident to the 9-1-1 call and that the child was put under cold water to wake him up.

Dr. Frank Culicchia was accepted as an expert in neurosurgery. He testified that on April 24, 2016, he was the neurosurgeon on call at UMC, and the emergency room doctors referred H.U. to him. Dr. Culicchia explained that he reviewed the CT scans that were taken and saw a subdural hematoma on the images, which was a blood clot between the skull and the brain. Dr. Culicchia testified that the subdural hematoma was putting pressure on the brain causing it to be pushed over and swollen. He asserted that this was something that had "immediately happened," and that something needed to be done to relieve the pressure in H.U.'s brain. Dr. Culicchia noted that the scalp did not show swelling and there was no skull fracture. He provided that H.U. was taken immediately into

surgery, where they removed the blood clot and part of the skull to allow the brain to swell. However, Dr. Culicchia did not think the child was going to survive.

Dr. Culicchia testified that he was told H.U. fell down stairs, which did not make sense to him because there was no external evidence of trauma. He saw a small bruise on H.U.'s forehead, but it was unrelated to his internal injuries and showed discoloration indicating it had been there for some time. He noted that there was no abrasion, skin breakage, or laceration on the scalp or face to explain the injury and this alarmed him.

Dr. Culicchia asserted that an ophthalmologist was consulted because with no evidence of external trauma, there was a strong suspicion of shaken baby syndrome. He explained that retinal hemorrhages were typically found in shaken baby cases and that H.U. had retinal hemorrhages in both eyes. Dr. Culicchia testified that the child could not have received his injuries from falling down the stairs or out of his caretaker's arms. Rather, his injuries were much more likely caused by shaken baby syndrome. He asserted that H.U.'s injuries were acceleration/deceleration injuries and not from an impact with any object or surface. Dr. Culicchia testified that the surgery was not successful and that H.U. was declared brain dead on April 27, but they kept him alive until April 29 so his organs could be harvested.

Dr. Peter Kastl, who was accepted as an expert in ophthalmology, testified that on April 25, 2016, he was called to examine H.U. based on a suspicion of abuse. Although he did not examine H.U., a resident did and found bilateral retinal hemorrhaging in all four quadrants of the eyes with no external trauma. Dr. Kastl maintained that he had not seen any other child this age with bilateral retinal hemorrhaging to this extent except in shaken baby syndrome. He opined that H.U. could not have sustained the injuries in any way other than shaken baby syndrome.

Dr. Dana Troxclair, the chief forensic pathologist for the Jefferson Parish Coroner's Office, was accepted as an expert in forensic pathology. Dr. Troxclair testified that she performed an autopsy of H.U. on April 29, 2016, at 7:00 a.m., and found that the cause of death was blunt force trauma to the head and the manner of death was homicide. She explained that her findings of subdural hematoma, retinal hemorrhages bilateral in all four quadrants, and cerebral edema were seen in shaken baby syndrome. Dr. Troxclair explained that the child's injuries did not appear to result from a short fall, because she did not see a contusion on the opposite side of the brain. She also explained that with short falls, the patient usually has an epidural hematoma, not a subdural hematoma. Also, Dr. Troxclair stated that with short falls, patients do not have symptoms right away or hemorrhages in both eyes bilaterally. Dr. Troxclair concluded that H.U. died as a result of shaken baby syndrome.

Stephen Hayes testified that he had known defendant for approximately twenty years. He stated that his mother was a registered nurse in the emergency room at Children's Hospital. Mr. Hayes asserted that on April 24, 2016, at approximately 8:15 a.m., defendant called him and asked where his mother was, but he did not know. Mr. Hayes stated that he heard "panicked chaos," with a lot of noises and shuffling in the background. Mr. Hayes testified that defendant told him H.U. had fallen and was unconscious, and defendant was pleading with the child to wake up. Mr. Hayes recalled that he immediately told defendant to take the child to the emergency room. He stated that he could hear the faucet turned on, the water running, and then the shower.

Julienne Frederico, H.U.'s mother, testified that she met defendant and developed a relationship with him after moving to Louisiana with H.U. She asserted that her job took her out of state once a month. On the morning of April 24, 2016, defendant took her to the airport for a trip to California. She recalled that

H.U. was crying because she was leaving him. Ms. Frederico provided that she and defendant texted each other while she was in the airport, and that as she was about to board the airplane, she got a message from defendant saying "H.U. broke my f*cking chain." She stated that she then spoke to defendant and told him they could have the chain repaired and that it was not a big deal. She further testified that when she asked where H.U. was, defendant said he was "throwing a fit in his room." Ms. Frederico stated that defendant sounded extremely upset, so she told him to take a break and smoke a cigarette. She also told defendant that it would be a difficult day for H.U. and that he would need more affection.

Ms. Frederico asserted that when she was at a stop in Houston, she received a phone call from defendant, but she could not speak to him because they were about to take off. She then received a message from a deputy indicating there was an emergency and she needed to call. Ms. Frederico called and learned that there was an accident and that H.U. was unconscious and on his way to the hospital. She later learned that her son died.

Ms. Frederico admitted writing a letter to defendant after the incident, telling him it was an accident; however, she explained that she had no medical expertise and was a grieving, abused young mother in denial. She also admitted that she went back to defendant for more than two years, but this was a bad decision.

Defendant testified at trial that he met Ms. Frederico in August of 2015 and their relationship became serious. Defendant explained that he and Ms. Frederico were always together when she was in town, but she went out of town for work once a month. He stated that Ms. Frederico initially left H.U. with her mother, but in 2016 he started caring for H.U. when she was out of town. Defendant stated that there were no problems with H.U., other than him throwing tantrums during which he would throw himself on the ground and hit his head against the wall. He

indicated that the tantrums generally occurred after Ms. Frederico left. Defendant stated that he never physically reprimanded H.U. nor did he strike or shake him.

Defendant testified that on April 24, 2016, he dropped Ms. Frederico off at the airport. When he and H.U. returned home, H.U. was crying and upset, so he brought H.U. to his room to get his toys. He provided that H.U. grabbed the chain Ms. Frederico had just bought him and the chain popped. Defendant testified that he called Ms. Frederico and told her what happened. He acknowledged using a lot of "f bombs" in the conversation but said it was not because he was angry. He explained that after the call, he went back into H.U.'s room because he heard H.U. hitting his head against the wall. He picked him up to put him into his crib, and while holding H.U. with his left hand, he took the toys out of the crib with his right hand so H.U. would not climb on top of them and fall. Defendant maintained that when he got to the last of the toys, H.U. flung himself backward, hit his head, and landed on the ground. Defendant said he panicked and thought H.U. might have "paralyzed himself" when he saw how H.U. was lying. He stated that he picked him up and that H.U. started spitting things up and had trouble breathing.

Defendant testified that he called Mr. Hayes because his mother was a nurse. While he was on the phone, he put H.U. under the shower to try to wake him up. Defendant said that he called his father and asked him to call 9-1-1. He explained that he did not like talking to strangers, especially police officers, but he was not "dillydallying" or trying to hide anything. He stated that a dispatcher called at some point and told him an ambulance was outside. Defendant admitted that he was not truthful with Deputy Obiol when he arrived. Defendant also admitted that he was not truthful when he gave a statement to the police at the detective bureau.

Defendant testified that after H.U.'s death, he and Ms. Frederico continued to see each other for almost two years until 2018. Defendant denied losing his temper after H.U. broke the chain, and he denied having a heated conversation

with Ms. Frederico after the chain broke.  He admitted that he lied when he said H.U. fell down the steps in order to protect himself, because "they always blame the boyfriend."

Dr. Zhongxue Hua testified for the defense that he was the chief medical examiner for Bergen County, New Jersey, and he was accepted as an expert in neuropathology and forensic pathology.  Dr. Hua testified that he reviewed Dr. Troxclair's autopsy report, the death certificate, the scene and autopsy photographs, the x-ray reports, the microscopic slides, the EMS report, the neuropathology reports, and the medical records of the last five days of H.U.'s life.

Dr. Hua concluded that H.U. died from blunt head trauma from a single impact, which was most consistent with a short fall injury.  He explained there were case studies that showed that short falls could cause subdural hematomas.  Dr. Hua pointed out that Dr. Culicchia testified there were no scalp contusions, but the medical records reflected that on April 24, 2016, at 1:21 p.m., Dr. Neil Patel observed a contusion on the child's head, specifically at the right side parietal back and top of the head.  He noted that the records show Dr. Culicchia confirmed this observation twice on that same date.  Dr. Hua testified that the CT scan taken at 9:40 a.m. showed swelling on the right parietal region.  He stated that these observations were made prior to surgery, which was important because surgery generated new wounds and caused bleeding in the whole area.

Dr. Hua explained that Heparin was given to H.U. as part of the organ harvesting, which promoted bleeding.  He testified that brain swelling, increased intracranial pressure, and coagulation problems can cause retinal hemorrhaging.  He further testified that there were too many medical interventions to make a valid conclusion of retinal hemorrhaging due to shaken baby syndrome.  Dr. Hua indicated there was no neck injury and no medical or forensic evidence to support a diagnosis of shaken baby syndrome in this case.

The defense also called Dr. Michael Baden, an expert in forensic pathology, who testified that he was asked to evaluate the cause and manner of H.U.'s death. He reviewed the autopsy report, the scene and autopsy photographs, the x-rays, the microscopic slides, the neuropathology consultation report, the death certificate, the JPSO reports, medical records, and Louisiana Organ Procurement Agency records and photographs. Dr. Baden concluded that the findings were consistent with an accidental fall and were not consistent with the child being shaken to death. He opined that the cause of death was blunt force trauma to the head, which caused the subdural hemorrhage. Dr. Baden also asserted that a person can have extensive retinal hemorrhaging after a fall and that it was impossible to evaluate the cause of retinal hemorrhaging after H.U. had surgery.

Dr. Baden also testified that the CT scans showed scalp swelling and the medical records showed there was a contusion on the top of H.U.'s head, which indicated an impact and precluded a finding of shaken baby syndrome. Dr. Baden opined that the bruises on H.U.'s body, except for the forehead, occurred after he was admitted to the hospital. Dr. Baden maintained that organ donations change the body due to chemicals, like Heparin. He testified that the belief that shaking causes subdural hemorrhages was "junk science" and that all babies are shaken.

## LAW AND DISCUSSION

On appeal, defendant raises two assignments of error. In his first assignment of error, defendant argues that the evidence presented at trial was insufficient to support his negligent homicide conviction. He contends that the State failed to show that defendant had such disregard for H.U. that his conduct amounted to a gross deviation below the standard of care expected to be maintained by a reasonably careful person under like circumstances. Defendant maintains that the testimony showed that he was holding H.U. appropriately when the child started a tantrum and threw himself out of defendant's arms, falling and hitting his head.

Defendant asserts that the medical records show blunt force impact and a right parietal contusion on H.U.'s scalp, which support a finding that H.U. fell.

The State responds that it presented sufficient evidence to support defendant's conviction. It notes that its experts found that H.U.'s fatal injuries were caused by shaken baby syndrome, and that defendant was the only person with H.U. when he sustained his injuries. The State also asserts that there was sufficient evidence to convict defendant of the charged offense, second degree murder, and therefore, it was also sufficient to support his conviction of the lesser-included offense, negligent homicide.

The constitutional standard for testing the sufficiency of the evidence, as enunciated in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Ortiz,* 96-1609 (La. 10/21/97), 701 So.2d 922, 930, *cert. denied,* 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998); *State v. Scott,* 06-134 (La. App. 5 Cir. 7/25/06), 939 So.2d 462, 470, *writ denied,* 06-2133 (La. 3/30/07), 953 So.2d 61. Under the *Jackson* standard, a review of a criminal conviction record for sufficiency of the evidence does not require the court to ask whether it believes that the evidence at trial established guilt beyond a reasonable doubt. *State v. Flores*, 10-651 (La. App. 5 Cir. 5/24/11), 66 So.3d 1118, 1122. Rather, the reviewing court must decide, after viewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *Id.*; *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781; *Ortiz*, 701 So.2d at 930.

Evidence may be either direct or circumstantial. *Flores*, 66 So.3d at 1122. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact can be inferred according to reason and

common experience. *Id.*; *State v. Williams*, 05-59 (La. App. 5 Cir. 5/31/05), 904 So.2d 830, 833. When circumstantial evidence is used to prove the commission of an offense, La. R.S. 15:438 provides that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." *State v. Wooten*, 99-181 (La. App. 5 Cir. 6/1/99), 738 So.2d 672, 675, *writ denied*, 99-2057 (La. 1/14/00), 753 So.2d 208. This is not a separate test from the *Jackson* standard but rather provides a helpful basis for determining the existence of reasonable doubt. *Id.* All evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. *Wooten*, 738 So.2d at 675.

In the present case, defendant was charged with the second degree murder of H.U. At trial, the State proceeded under the felony murder theory for second degree murder, with cruelty to a juvenile as the underlying felony. Under the felony murder theory, second degree murder is defined as the killing of a human being: (2) when the offender is engaged in the perpetration or attempted perpetration of ... cruelty to juveniles ... even though he has no intent to kill or inflict great bodily harm. La. R.S. 14:30.1(A)(2). The felony murder provision of La. R.S. 14:30.1(A)(2) contains the circumstances under which a defendant can be found guilty under the felony murder rule, which dispenses with the necessity of proving *mens rea* accompanying a homicide; the underlying felony supplies the culpable mental state. *State v. Small*, 11-2796 (La. 10/16/12), 100 So.3d 797, 805.

Cruelty to a juvenile is defined in La. R.S. 14:93(A)(1) as the "intentional or criminally negligent mistreatment or neglect by anyone seventeen years of age or older of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child." Mistreatment, as used in this statute, means "abuse." *State v. Cortez*, 96-859 (La. App. 3 Cir. 12/18/96), 687 So.2d 515, 519; *State v. Comeaux*, 319 So.2d 897, 899 (La. 1975). In addition, to be criminally

negligent in his mistreatment or neglect of the child, the defendant must have such disregard for the interest of the child that his conduct amounted to a gross deviation below the standard of care expected to be maintained by a reasonably careful person under like circumstances. *State v. Porter*, 99-1722 (La. App. 3 Cir. 5/3/00), 761 So.2d 115, 123; *see also* La. R.S. 14:12.

Defendant was convicted of negligent homicide, which is a responsive verdict for the charge of second degree murder. La. C.Cr.P. art. 814(A)(3). Negligent homicide is "the killing of a human being by criminal negligence." La. R.S. 14:32(A)(1). "Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances." La. R.S. 14:12. Ordinary negligence does not equate to criminal negligence; the State is required to show more than a mere deviation from the standard of ordinary care. *State v. Jones*, 298 So.2d 774 (La. 1974).

If there is sufficient evidence to convict a defendant of a greater offense, which includes the offense for which defendant was convicted, the evidence will necessarily and automatically, because of Louisiana's statutory system of responsive verdicts, support the conviction for the lesser offense, as long as the defendant did not object to the inclusion of this lesser-included offense. *State v. Ducksworth*, 17-35 (La. App. 5 Cir. 12/13/17), 234 So.3d 225; *State v. Schrader*, 518 So.2d 1024, 1034 (La. 1988), *cert. denied*, 498 U.S. 903, 111 S.Ct. 265, 112 L.Ed.2d 221 (1990).

In *State v. Becnel*, 17-591 (La. App. 5 Cir. 6/27/18), 250 So.3d 1207, the defendant was indicted for the second degree murder of three-year-old P.S. under both the specific intent and felony murder theories. La. R.S. 14:30.1(A)(1) and (A)(2). He was convicted of the lesser-included offense of negligent homicide.

The underlying felony that the defendant was alleged to have committed was cruelty to juveniles, in violation of La. R.S. 14:93. *Id.* at 1226. On appeal, the defendant argued that the State's circumstantial case was insufficient to prove he committed negligent homicide. However, he did not object at trial to the inclusion of negligent homicide as a lesser-included offense of second degree murder. This Court found that because the evidence established that the defendant committed second degree murder by killing P.S. while engaged in the perpetration of cruelty to a juvenile through his negligent mistreatment of P.S., the evidence was sufficient to convict the defendant of the lesser-included offense of negligent homicide. *Becnel*, 250 So.3d at 1226-1227. This Court reasoned that although a compromise verdict may have been reached by the jury, the verdict of negligent homicide was nevertheless valid, given that the evidence presented would have reasonably supported the charged offense. *Id.* at 1229.

In the instant case, like in *Becnel*, *supra*, defendant did not object to the inclusion of negligent homicide as a lesser-included offense. The record shows that a rational trier of fact could have found that the evidence was sufficient under the *Jackson* standard to convict defendant of the greater offense, second degree murder, and therefore, the evidence automatically supported the conviction of the lesser offense, negligent homicide.

The State's experts testified that H.U. died from blunt force trauma to the head caused by shaken baby syndrome. Dr. Mooney, the UMC trauma surgeon, testified that the child's injuries were not caused by accidental trauma and were inconsistent with defendant's story. Dr. Culicchia, the neurosurgeon who treated H.U., testified that he could not have received his injuries from falling out of his caretaker's arms. He explained that taking into consideration the retinal hemorrhages and the lack of a scalp injury or skull fracture, H.U.'s severe brain injury was much more likely caused by shaken baby syndrome. Dr. Kastl, an

ophthalmologist, testified that the bilateral retinal hemorrhaging in all four quadrants of the child's eyes with no external trauma could have only occurred from shaken baby syndrome.

In addition, Dr. Troxclair, a forensic pathologist, performed the autopsy and found the manner of death was homicide by shaken baby syndrome. She stated that her findings of subdural hematoma, retinal hemorrhages in all four quadrants, and cerebral edema were seen in shaken baby syndrome cases. Dr. Troxclair testified that there was nothing on H.U.'s body that was consistent with a fall.

Further, the State presented evidence to show that defendant got very angry with the child around the time of the incident. Detective Zanotelli testified that at 8:05:43, defendant sent Ms. Frederico a message that said, "H.U. just broke the f*cking chain you got me." Ms. Frederico recalled a heated conversation with defendant immediately thereafter. Additionally, defendant admitted that he initially lied to EMS, the police, and the child's mother when he said H.U. fell down the stairs. In his statement, defendant concocted a story wherein he said that he brought the child into the kitchen where the back door was open, and after he heard some sounds, he saw H.U. lying at the bottom of the steps. Later, at trial, defendant testified that none of this was true. Rather, he asserted that he was holding H.U. and taking toys out of the crib when H.U. flung himself backward and hit his head. He denied shaking H.U. or being angry with him.

Contrary to the State's experts, the defense experts testified that although the child died from blunt force trauma to the head, his injuries were accidental. Dr. Hua, a forensic pathologist, concluded that the child died of blunt head trauma from a single impact, which he believed was most consistent with a short fall. He pointed out discrepancies in Dr. Culicchia's testimony and the medical records, noting that Dr. Culicchia confirmed in the medical records that a contusion was observed on H.U.'s head on April 24, 2016, but Dr. Culicchia testified at trial that

there was no external evidence of trauma. Dr. Hua also testified that brain swelling, increased intracranial pressure, and coagulation problems can cause retinal hemorrhaging, and there were too many medical interventions to make a valid conclusion of retinal hemorrhaging due to shaken baby syndrome. Dr. Hua further testified that there was no medical or forensic evidence to support a diagnosis of shaken baby syndrome.

Likewise, Dr. Baden, a forensic pathologist, testified that H.U.'s injuries were consistent with a fall and inconsistent with the child being shaken to death. He asserted that a person can have retinal hemorrhaging after a fall and that it was impossible to evaluate the cause of retinal hemorrhaging due to H.U.'s surgery. Dr. Baden pointed out that the medical records showed there was a contusion on the top of H.U.'s head and there was clearly an impact, which precluded a finding of shaken baby syndrome. Dr. Baden opined that individuals cannot sustain subdural hemorrhages from internal impacts by shaking.

The jury considered the testimony of the witnesses and had to make credibility determinations. The trier of fact shall evaluate credibility, and when faced with a conflict in testimony, is free to accept or reject, in whole or in part, the testimony of any witness. *State v. Bradley*, 03-384 (La. App. 5 Cir. 9/16/03), 858 So.2d 80, 84, *writs denied*, 03-2745 (La. 2/13/04), 867 So.2d 688, and 08-1951 (La. 1/30/09), 999 So.2d 750. It is not the function of the appellate court to assess credibility or re-weigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So.2d 442, 443.

When faced with the conflicting expert opinions presented by the State and the defense, the jury was entitled to accept whichever one better explained the facts of the incident. *Id.* A jury's decision to accept one expert's opinion over another should not be disturbed by this Court unless that opinion is patently unsound. *Becnel*, 250 So.3d at 1229.

Considering defendant's anger when the child broke his chain, the child's severe injury moments later, defendant's lies about how he was injured, and the testimony of the State's experts that the child's injuries were consistent with shaken baby syndrome and inconsistent with a short fall, the jury could have reasonably credited the State's version of events over that of defendant. Although the jury may have reached a compromise verdict, the verdict was valid given that the evidence presented would have reasonably supported a conviction for second degree murder. *See State v. Miller*, 15-720 (La. App. 3 Cir. 2/3/16), 185 So.3d 264, 269. This assignment of error is without merit.

In his second assignment of error, defendant argues that he was denied the right to a fair trial and due process of law when the trial court prohibited him from calling an expert witness, Dr. John Galaznik, at trial. He asserts that the trial court did not reference any of the *Daubert*[2] requirements in its ruling or make any findings as to admissibility. Defendant complains that although the trial judge refused to allow Dr. Galaznik to testify because he believed he was going to act as a thirteenth juror, the trial judge allowed the State's experts to act as thirteenth jurors and testify that the child's injuries resulted from shaken baby syndrome and that all other reasonable causes could be excluded.

The State responds that the trial court did not abuse its discretion by not allowing Dr. Galaznik to testify at trial. It further responds that defendant's claim that he was prohibited from presenting a defense is difficult to fathom given that he was allowed to present the expert testimony of two forensic pathologists, Dr. Hua and Dr. Baden, to dispute the State's account. The State asserts that while it disputes the conclusions of these defense experts and while the jury rationally rejected their conclusions, these defense experts were qualified to testify as to their

---

[2] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

subject matter. However, Dr. Galaznik was not qualified to testify as an expert on shaken baby syndrome. The State also responds that Dr. Galaznik intended to testify at trial regarding the ultimate issue before the jury, which was prohibited by La. C.E. art. 704.

On May 2, 2022, the State filed a "Motion for Daubert and La. CE Art. 702 Hearing for Dr. John Galaznik." In that motion, the State asserted that based on Dr. Galaznik's curriculum vitae and expert report dated April 28, 2022, the expertise of Dr. Galaznik was unclear, and the literature and methodology that Dr. Galaznik relied upon were not generally accepted by the medical community. As such, the State requested a *Daubert* hearing.

On May 5, 2022, a *Daubert* hearing was held. At that hearing, Dr. Galaznik testified that he was board certified in pediatrics and had an active medical license in Alabama. He explained that he became interested in shaken baby cases after serving on a jury in a capital murder case. He further explained that in 2001, he retired from full-time employment to pursue his interest in physical injury of infants and small children, which usually involved issues of blunt force impact, abusive shaking, or multiple fractures. Dr. Galaznik testified that he had qualified as an expert in pediatrics in thirty-two states, Canada, New Zealand, and the military. He provided that shaken baby syndrome has become fairly controversial, asserting that in 2001, it was accepted that short falls did not cause subdural bleeding, retinal hemorrhaging, or brain injuries, whereas by 2018, it was accepted that short falls could cause them.

Following this testimony, defense counsel offered Dr. Galaznik as an expert in pediatrics, specifically shaken baby syndrome. The prosecutor then questioned Dr. Galaznik regarding his qualifications. Dr. Galaznik testified that in his pediatric practice, he treated young children and college students. He explained

that he did not pursue a pediatric child abuse fellowship when it became available in 2009 because he was only interested in a small group of cases in that specialty.

Dr. Galaznik testified that his role was to bring the available science to the courtroom and apply it to the objective data, which in this case was the imaging, lab studies, autopsy, and physical exams. He explained that there was physical evidence of blunt force impact in this case, but it was not his role to say whether it was accidentally or intentionally inflicted. Dr. Galaznik asserted that his job was to evaluate the quality of the job the doctors did. He testified that where a short fall history was offered, if it plausibly accounted for the finding, then doctors should not be able to come to court and assert that this case represented abusive injury. He further provided that his role was to say that an impact injury to H.U.'s head was able to produce large volume subdural brain infarction, death, subdural bleeding, and extensive retinal hemorrhaging and that shaking was not a requisite component to produce any of those findings.

Following Dr. Galaznik's testimony, the trial judge decided that he was not going to allow Dr. Galaznik to testify at trial, stating:

> The Court heard testimony from Dr. Galaznik, and as the gatekeeper, the Court is going to exercise that gatekeeper function and preclude Dr. Galaznik from testifying. While Dr. Galaznik might be a board-certified pediatrician, the Court from hearing what he intends to opine on believes that he intends to act as the 13th juror and opine that every other reasonable hypothesis could not be excluded. The Court is not going to allow this courtroom to become a research paper. And it appears that he intends to simply surmise all of his research in a field that he is challenging at the moment. And the Court does not find he is qualified to do so to this jury.

Defense counsel objected to the court's ruling. The trial judge also stated:

> What I heard from the witness testimony is that he is going to say, based upon all of his looking at these, he's going to bring a number of reports and he's attempting to challenge a certain field that he essentially testified as - - in this court's opinion what I heard - - I don't have a report in front of me. Nobody handed me a report and said here's what he was going to testify to. What I heard from the witness stand was that he would say and suggest that every other reasonable hypothesis has not been excluded. That's what I heard

from the witness stand. And as a result - - as a result the Court does not find that he is permitted to testify in this manner.

****

I heard him making a legal conclusion, which is what [sic] I did what I did.

The defendant's right to present a defense is guaranteed by the Sixth Amendment to the United States Constitution and Article I, § 16 of the Louisiana Constitution. *State v. Lirette*, 11-1167 (La. App. 5 Cir. 6/28/12), 102 So.3d 801, 813, *writ denied*, 12-1694 (La. 2/22/13), 108 So.3d 763. This right, however, does not necessitate that a trial court allow the introduction of evidence that is inadmissible, irrelevant, or has so little probative value that it is substantially outweighed by other legitimate considerations in the administration of justice. *Id.*

La. C.E. art. 702 governs the admissibility of expert testimony and provides:

A. A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(1) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(2) The testimony is based on sufficient facts or data;

(3) The testimony is the product of reliable principles and methods; and

(4) The expert has reliably applied the principles and methods to the facts of the case.

La. C.E. art. 704 provides the law regarding opinion on the ultimate issue:

Testimony in the form of an opinion or inference otherwise admissible is not to be excluded solely because it embraces an ultimate issue to be decided by the trier of fact. However, in a criminal case, an expert witness shall not express an opinion as to the guilt or innocence of the accused.

In *State v. Foret*, 628 So.2d 1116 (La. 1993), the Louisiana Supreme Court adopted the test set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), regarding proper standards for

the admissibility of expert testimony, which require the trial court to act in a gatekeeping function to ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable. *State v. Boudoin*, 11-967 (La. App. 5 Cir. 12/27/12), 106 So.3d 1213, 1225, *writ denied*, 13-255 (La. 8/30/13), 120 So.3d 260. The *Daubert* inquiry consists of four considerations: (1) whether the theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the methodology is generally accepted by the relevant scientific community. *Id.* at 1225.

In *State v. Francois*, 13-616 (La. App. 5 Cir. 1/31/14), 134 So.3d 42, 59, *writ denied*, 14-431 (La. 9/26/14), 149 So.3d 261, this Court discussed the Louisiana Supreme Court's recognition of a limitation of the *Daubert* inquiry:

> In 2003, ten years after adopting *Daubert*, the Louisiana Supreme Court recognized a limitation of the *Daubert* inquiry. *Cheairs v. State ex rel. Dep't of Transp. & Dev.*, 03-0680 (La. 12/3/03), 861 So.2d 536, 541-42. In *Cheairs*, the defendant challenged the qualification of the plaintiff's witness as an expert on the ground that his education did not qualify him to give opinion testimony on a particular matter. *Id.* at 541.
>
> The *Cheairs* Court observed that *Daubert* only addresses the reliability of the methodology used by the expert, not the adequacy of the expert's qualifications. *Id.* at 542. Therefore, the court adopted a broader three-prong inquiry developed by the U.S. Eleventh Circuit "to more fully assist [trial] courts in determining all the relevant issues related to the admissibility of expert testimony[.]" *Id.* This three-prong inquiry was first set forth in *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548 (11th Cir.1998), in which the Court stated that the admission of expert testimony is proper only if all three of the following are true:
>
> > (1) [T]he expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

A trial judge's decision to qualify an expert witness or to admit or exclude certain expert testimony is subject to an abuse of discretion standard. *State v. Stokes*, 99-1287 (La. App. 5 Cir. 4/13/00), 759 So.2d 980, 984, *writ denied*, 00-1219 (La. 2/16/01), 802 So.2d 607.

Based on the testimony and applicable law, including the considerations set forth in *Daubert*, *supra*, we cannot say that the trial judge abused his discretion by prohibiting Dr. Galaznik from testifying as an expert at trial. At the hearing, Dr. Galaznik testified that in the instant case, where a short fall history was offered, doctors should not be able to come to court and assert that this case represented abusive injury. Although Dr. Galaznik admitted that he was not a pathologist, a neurosurgeon, a radiologist, an ophthalmologist, or a specialist in child abuse pediatrics, he testified that his job was to evaluate the quality of the job the doctors did in this case. We find no error in the trial court's determination that Dr. Galaznik was not qualified to testify in this manner.

Further, we note that defendant was not denied his right to present a defense. Dr. Hua and Dr. Baden, both qualified forensic pathologists, testified on defendant's behalf that the child's injuries resulted from a fall and not shaken baby syndrome. Accordingly, this assignment of error is without merit.

**ERRORS PATENT**

The record was reviewed for errors patent, according to La. C.Cr.P. art. 920; *State v. Oliveaux*, 312 So.2d 337 (La. 1975); and *State v. Weiland*, 556 So.2d 175 (La. App. 5 Cir. 1990). One error requiring corrective action was noted.

The sentencing minute entry indicates that defendant was advised of the prescriptive period for requesting post-conviction relief. However, a review of the transcript reveals that the trial judge did not advise defendant of the prescriptive

period for filing for post-conviction relief.  The transcript generally prevails.  *State v. Lynch*, 441 So.2d 732, 734 (La. 1983).

If the trial court fails to advise, or provides an incomplete advisal, pursuant to La. C.Cr.P. art. 930.8, the appellate court may correct this error by informing the defendant of the applicable prescriptive period for post-conviction relief by means of its opinion.  *See State v. Perez*, 17-119 (La. App. 5 Cir. 8/30/17), 227 So.3d 864, 870.  Therefore, we hereby advise defendant that no application for post-conviction relief, including applications that seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of La. C.Cr.P. arts. 914 or 922.

**DECREE**

For the foregoing reasons, we affirm defendant's conviction and sentence for negligent homicide.

**AFFIRMED**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
CORNELIUS E. REGAN, PRO TEM

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **APRIL 26, 2023** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

**22-KA-457**

### E-NOTIFIED
24TH JUDICIAL DISTRICT COURT (CLERK)
HON. SCOTT U. SCHLEGEL (DISTRICT JUDGE)
DARREN A. ALLEMAND (APPELLEE)       THOMAS J. BUTLER (APPELLEE)       ROGER W. JORDAN, JR. (APPELLANT)

### MAILED
JAMES A. WILLIAMS (APPELLANT)          HONORABLE PAUL D. CONNICK, JR.
ATTORNEY AT LAW                        (APPELLEE)
706 DERBIGNY STREET                    DISTRICT ATTORNEY
GRETNA, LA 70053                       JENNIFER C. VOSS (APPELLEE)
                                       MATTHEW WHITWORTH (APPELLEE)
                                       ASSISTANT DISTRICT ATTORNEYS
                                       TWENTY-FOURTH JUDICIAL DISTRICT
                                       200 DERBIGNY STREET
                                       GRETNA, LA 70053